UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re Hearst Communications State Right of Publicity Statute Cases

No. 21-cv-8895 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

This is a right of publicity case in which the plaintiffs readily admit that there has been no violation of the right of publicity. Twenty named plaintiffs[1] (collectively, "Plaintiffs") bring this putative class action against Hearst Communications, Inc. ("Hearst") for selling, renting, or otherwise disclosing its magazine subscriber lists, which include Plaintiffs' names and other information, to third parties. There is no allegation that the names are ever made public, or that the third-party recipients are even aware of the names included on the lists before obtaining them. Nevertheless, Plaintiffs contend that this practice misappropriates their identities, and thus violates what they characterize as "misappropriation" statutes in nine jurisdictions: Alabama, California, Hawaii, Indiana, Nevada, Ohio, South Dakota, Washington, and Puerto Rico.

But the statutes Plaintiffs invoke—regardless of how they label them—are right of publicity statutes in both name and substance. These statutes, which stem from a parallel common law cause of action, protect the property interest that individuals have in the value of their own publicity. They are not, however, implicated any time a person's personal information is exchanged for profit.

---

[1] The named plaintiffs are Tiffani Anderson (on behalf of the Alabama Class), Barbara Leach and Kimberly Lantz (on behalf of the Indiana Class), Cathy McGruder (on behalf of the Hawaii Class), Dwana Eslinger, Belinda Powers and Cathy Ricketts (on behalf of the South Dakota Class), Judith Shaw, Joan Burke and William Martin (on behalf of the California Class), Lauren Sandberg (on behalf of the Nevada Class), Nicki Mahood, Joyce Hicks, Stephen Goldberger and Dawn Begin (on behalf of the Ohio Class), Rebecca Venable (on behalf of the Washington Class), and Shirley Collazo, Maribel Ramirez, Maricarmen Ocasio and Magda Lopez (on behalf of the Puerto Rico Class).

The Court expresses no view as to whether the practice of selling subscriber information, without the subscribers' consent, is cause for concern. What is clear, and what resolves this case, is that the sale of subscriber lists here does not infringe on the right of publicity. Accordingly, and for the reasons that follow, Hearst's motion to dismiss is granted.

## BACKGROUND[2]

Hearst is a mass media conglomerate that publishes a variety of magazines, including *Car and Driver*, *Cosmopolitan*, *Country Living*, *Elle*, *Esquire*, *Food Network Magazine*, *Good Housekeeping*, *Harper's Bazaar*, *HGTV Magazine*, *O, The Oprah Magazine*, *Seventeen*, *Town & Country*, and *Women's Day*. Plaintiffs are twenty residents of, respectively, Alabama, California, Hawaii, Indiana, Nevada, Ohio, South Dakota, Washington, and Puerto Rico, who subscribe to at least one of Hearst's magazines. Compl. ¶¶ 34-53. Each class is defined as the residents of the respective state "who appear in any of Hearst's Data Brokerage Products." *Id.* ¶¶ 70-78.

Plaintiffs allege that when Hearst sells a magazine subscription to a consumer, the consumer's information—including her name, home address, and magazine subscription preferences—is stored in a digital database maintained by Hearst. *Id.* ¶ 60. Hearst allegedly does not ask the consumer to agree to any terms of service or privacy policy before storing this data. *Id.* ¶ 59. According to Plaintiffs, Hearst then packages this information into what Plaintiffs call "Data Brokerage Products," which are "sold, licensed, rented, exchanged, and otherwise disclosed" to third parties. *Id.* ¶ 62. These third parties, which Plaintiffs refer to as the "Data Brokerage Clients," allegedly include "data miners, data aggregators, data appenders, data cooperatives, list rental recipients, list exchange recipients, and/or list brokers." *Id.* ¶ 2.

---

[2] These facts are drawn from the Consolidated Amended Class Action Complaint, which, on a motion to dismiss, the Court must assume to be true. *See Lynch v. United States*, 952 F.3d 67, 74-75 (2d Cir. 2020).

Tiffani Anderson, who represents the Alabama Class, was the first named plaintiff to file a complaint against Hearst in this action. After the remaining named plaintiffs filed their respective complaints, the parties stipulated to consolidating the actions before this Court. Plaintiffs then filed the Consolidated Amended Class Action Complaint (the "Complaint"). The Complaint sets forth nine causes of action, alleging violations of right of publicity statutes in nine jurisdictions: Alabama, Ala. Code § 6-5-770, *et seq.*; California, Cal. Civ. Code § 3344; Hawaii, Haw. Rev. Stat. § 482P-1, *et seq.*; Indiana, Ind. Code § 32-36-1-1, *et seq.*; Nevada, Nev. Rev. Stat. § 597.770, *et seq.*; Ohio, Ohio Rev. Code Ann. § 2741.01, *et seq.*; South Dakota, S.D. Codified Laws § 21-64-1, *et seq.*; Washington, Wash. Rev. Code § 63.60.010, *et seq.*; and Puerto Rico, P.R. Laws Ann. tit. 32, § 3151, *et seq*. *See* Compl. ¶¶ 86–186. Plaintiffs seek statutory damages and injunctive relief in each jurisdiction, as well as punitive damages where available. *Id.* Hearst now moves to dismiss the Complaint in its entirety.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court must accept as true all factual allegations and draw all reasonable inferences in Plaintiffs' favor, *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008), but it need not credit "mere conclusory statements," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more

3

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted).

## DISCUSSION

Hearst argues that Plaintiffs' claims should be dismissed because they fall outside the scope of the right of publicity statutes. In the alternative, Hearst contends that, if selling the subscriber lists violates the right of publicity statutes, then those statutes would run afoul of the First Amendment. The Court agrees with Hearst on the statutory interpretation question, and thus need not address the constitutional challenge.

### I.     The Statutes

As an initial matter, the Court must determine whether the nine statutes at issue can be analyzed together. There is no dispute among the parties on this point. In their stipulation to consolidation, the parties agreed that, "[w]hile the statutes are not identical, and there may be factual issues and defenses unique to certain plaintiffs, the statutes are substantially similar and will include overlapping issues of law." Order and Stipulation to Consolidation ¶ 11. And in their briefing on the motion to dismiss, Plaintiffs discuss the statutes collectively as the so-called "Misappropriation Statutes," Pls. Opp. 1, while Hearst asserts that the nine statutes "all employ similar language to the same ends," Def. Br. 10. At oral argument, both parties agreed that the statutes can be addressed collectively. *See* Hr'g Tr. 21-22; 29.

Indeed, the statutes define the prohibition in very similar terms, stating some version of the following: A person is liable if she, without consent, "uses . . . the indicia of identity of a person, on or in products, goods, merchandise, or services . . . or for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services." Ala. Code § 6-5-772.[3]

---

[3] *See* Cal. Civ. Code § 3344 (prohibiting the use of "another's name . . . on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products" without consent); Haw.

Plaintiffs call the first clause ("on or in products") the "misappropriation" prong, and the second clause ("for purposes of advertising") the "endorsement" prong. Pls. Opp. 2. The only exception is Puerto Rico's statute, which Plaintiffs admit is narrower in reach, as it only contains a so-called "endorsement" prong: The statute prohibits the use of a person's likeness "in connection with an advertisement, offer, or sale of a product, merchandise, good, or service" without consent. P.R. Laws Ann. tit. 32, § 3151; *see* Pls. Opp. 10. Neither party identifies any other material differences in the statutory language, nor do they provide any conflicting analyses from different jurisdictions.[4]

Accordingly, the Court will jointly analyze the motion to dismiss on all nine counts, with the exception of Puerto Rico's statute.[5] *See Camacho v. Control Grp. Media Co., LLC*, No. 21-

---

Rev. Stat. § 482P-5 (prohibiting the use of a person's "name . . . on or in goods, merchandise, or services entered into commerce in this State, or for purposes of advertising products, merchandise, goods, or services" without consent); Ind. Code §§ 32-36-1-2, 32-36-1-8 (prohibiting the use of a person's name "for a commercial purpose" without consent, and defining "commercial purpose" as "[o]n or in connection with a product, merchandise, goods, services, or commercial activities," or "[f]or advertising or soliciting purchases of products, merchandise, goods, services, or for promoting commercial activities"); Nev. Rev. Stat. §§ 597.770, 597.810 (prohibiting "[a]ny commercial use of the name . . . of another" without consent and defining "commercial use" as "use of the name . . . on or in any product, merchandise or goods or for the purposes of advertising, selling, or soliciting the purchase of any product, merchandise, goods, or service"); Ohio Rev. Code Ann. §§ 2741.01, 2741.02 (prohibiting use of a person's name "for a commercial purpose" without consent, and defining commercial purpose as "the use of or reference to [a person's name] . . . [o]n or in connection with a place, product, merchandise, goods, services, or other commercial activities," or "[f]or advertising or soliciting the purchase of products, merchandise, goods, services, or other commercial activities"); S.D. Codified Laws §§ 21-64-1, 21-64-2 (prohibiting use of a person's name "for a commercial purpose" without consent, and defining "commercial purpose" as "the use of [a person's name] in connection with a product, merchandise, goods, service, or commercial activity," or "for advertising or soliciting purchases of a product, merchandise, goods, service, or for promoting a commercial activity"); Wash. Rev. Code § 63.60.050 (prohibiting the use of a person's name "on or in goods, merchandise, or products entered into commerce in this state, or for purposes of advertising products, merchandise, goods, or services").

[4] That is not to say that the right of publicity statutes across the country do not vary significantly—they do—but those variations are not material to this litigation, at least at the motion to dismiss stage. *See Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 598-99 (C.D. Cal. 2015) (describing differences among the fifty states' right of publicity statutes, including the existence of a complementary cause of action in tort, the statute of limitations, and the available damages).

[5] The dispute in this case is over the interpretation of the "on or in products" or so-called "misappropriation" prong. But as Plaintiffs admit, the Puerto Rico statute does not include such a prong, and Plaintiffs make no meaningful attempt to defend their claim under the Puerto Rico statute. The Puerto Rico claim is thus dismissed.

cv-1954-MMA (MDD), 2022 WL 3093306, at *30 (S.D. Cal. July 18, 2022) (addressing Alabama and California right of publicity claims under a single analysis for a motion to dismiss, because the parties "d[id] not provide any different analysis [under the two statutes], nor do they distinguish the statutes," and "it appears that the parties agree the statutes are not notably distinguishable at this stage of the case").

**II.     Analysis**

At its core, the parties' dispute is over the scope of the statutory phrase "uses . . . on or in products." Plaintiffs argue that Hearst is liable because it "uses" their names "on or in" the "Data Brokerage Products," which are then sold to third parties. Plaintiffs further contend—with no citation—that these "lists . . . plainly constitute products or goods" under the right of publicity statutes. Pls. Opp. 8. Hearst, on the other hand, argues that the "use" contemplated in the statutes is limited to "advertising, marketing, promotion, endorsement, or equivalent commercial activity." Def. Br. 7. Under Hearst's interpretation, the plaintiff's identity must be used to "promote" or "draw attention" to a separate product or service, in order to "influence a transaction" involving that product or service (e.g., to induce its purchase). *Id.* at 1-2, 6. Hearst urges the Court to reject Plaintiffs' "fiction" that an aggregated list of names is a product "separate from, and promoted by," the names themselves. *Id.* at 14.

**A.     Background on the Right of Publicity**

To understand the scope of these statutes, it is helpful to first address what a right of publicity is. Publicity rights "grew out of the right to privacy torts," *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 150 (3d Cir. 2013), but they are now a "widely recognized intellectual property right," *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322 (11th Cir. 2006); *see also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 967 (10th Cir. 1996) ("Like trademark and

6

copyright, the right of publicity involves a cognizable property interest."). In that sense, "the goal of maintaining a right of publicity is to protect the property interest that an individual gains and enjoys in his identity through his labor and effort." *Hart*, 717 F.3d at 151. When an individual's name or likeness "carr[ies] value" through such labor and effort, publicity rights are designed to "encourage further development of this property interest," because "unauthorized use . . . dilute[s] the value of the name and depriv[es] that individual of compensation." *Id.*; *see also* Melville B. Nimmer, *The Right of Publicity*, 19 L. & Contemp. Probs. 203, 216 (1954) ("[P]ersons who have long and laboriously nurtured the fruit of publicity values may be deprived of them, unless judicial recognition is given to what is here referred to as the right of publicity—that is, the right of each person to control and profit from the publicity values which he has created or purchased."). In other words, the right of publicity is meant to protect the *value* of an individual's name, likeness, or other indicia of identity, by preventing it from being commercially exploited by another.

The phrase "right of publicity" was first coined by the Second Circuit in *Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953), which involved the unauthorized use of a baseball player's photograph to sell chewing gum. In justifying the need for the right, the Second Circuit wrote:

> [I]t is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, bu[s]es, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures.

*Id.* at 868. Many states now recognize the right of publicity as a common law cause of action, and some have futher codified the right through statute, including the nine jurisdictions in this case.

*See, e.g.*, *Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 598 (C.D. Cal. 2015); *Kemp v. Tysonfood Grp., Inc.*, No. Civ. 5-96-173, 2004 WL 741590, at *4 (D. Minn. Mar. 30, 2004) (collecting cases).

## B. Sale of Subscriber Lists

Plaintiffs allege that Hearst violated the right of publicity statutes through the sale of its subscriber lists. Two other courts, however, have recently considered and rejected statutory right of publicity claims on the same theory. In *Huston v. Hearst Communications, Inc.*, the plaintiff brought a putative class action against this same defendant, Hearst, for the same activity—the sale of its subscriber lists, without the subscribers' consent. No. 21-cv-1196, 2022 WL 385176, at *1-2 (C.D. Ill. Feb. 7, 2022), *aff'd*, 53 F.4th 1097 (7th Cir. 2022). The *Huston* plaintiff alleged that this practice violates the Illinois Right of Publicity Act ("IRPA"), which prohibits the unauthorized use of a person's identity "for commercial purposes." 765 Ill. Comp. Stat. 1075/10. The IRPA defines "commercial purpose," in relevant part, as "the public use or holding out of an individual's identity . . . on or in connection with the offering for sale or sale of a product, merchandise, goods, or services." 765 Ill. Comp. Stat. 1075/5. As is the case here, the *Huston* plaintiff argued that the subscriber lists are a "product" that her name was used "on or in" without her consent. *Huston*, 2022 WL 385176, at *2-3.

The *Huston* court rejected this argument, explaining that the term "commercial purposes" is "limit[ed] . . . to situations where a person's identity is used to promote a 'separate product' or 'some other product,' apart from the person's identity itself." *Id.* at *2 (internal citations omitted) (quoting *Lukis v. Whitepages Inc.*, 542 F. Supp. 3d 831, 838 (N.D. Ill. 2020)); *see also id.* ("The IRPA prohibits the use of an individual's identity to promote or entice the purchase of some other product."). Subscriber lists, the court reasoned, do not meet this definition of "commercial purpose." *See id.* at *3 ("The plaintiffs' identities are not used to promote a separate product—

8

they are used because plaintiffs' identities are part of the product offered for sale." (quoting *Dobrowolski v. Intelius, Inc.*, No. 17-cv-1406, 2018 WL 11185289, at *3 (E.D. Ill. May 21, 2018))). The court thus granted Hearst's motion to dismiss the claim. *Id.*

Plaintiffs argue that *Huston* "has no bearing here whatsoever," because the IRPA does not contain the same language prohibiting the use of a person's identity "on or in" a product. Pls. Opp. 9. Rather, the IRPA prohibits the use of a person's identity "on or in connection with *the offering for sale or sale* of a product," which, according to Plaintiffs, is a narrower prohibition than simply barring the use of an individual's identity "on or in" a product. *Id.* (emphasis added by Plaintiffs) (quoting 765 Ill. Comp. Stat. 1075/5). Indeed, while the Seventh Circuit affirmed the district court's decision in *Huston*, it relied on the fact that "[o]n its face, the [IRPA] prohibits the use or holding out of a person's identifying information *to offer to sell or sell* a product, piece of merchandise, good, or service." 53 F.4th at 1101 (emphasis in original); *see also id.* at 1102 ("IRPA does not prohibit the use of someone's identity on a product. It prohibits, under the first commercial use prong, the use of someone's identity 'on . . . the offering for sale or sale of a product.'").

Even assuming Plaintiffs are correct that such a distinction is meaningful, *Huston* was not the last word on Plaintiffs' theory. More recently, a district court in Vermont addressed nearly identical claims brought against the Orvis Company ("Orvis") under right of publicity statutes in California, Ohio, and Illinois. *See Farris v. Orvis Company, Inc.*, No. 2:22-cv-00007, 2022 WL 10477051 (D. Vt. Oct. 18, 2022). The *Farris* plaintiffs alleged that Orvis violated their right of publicity by selling and renting its mailing lists, which included the plaintiffs' names, to third parties. *Id.* at *1. In moving to dismiss, Orvis made the same argument that Hearst is making here, that there is no right of publicity implicated "where the plaintiff's identity *is* the product

9

being sold." *Id.* at *3 (emphasis in original).  The *Farris* court agreed with Orvis on all three counts, finding no actionable right of publicity claim in any jurisdiction.

In doing so, *Farris* relied on an analogous case, *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC, 2021 WL 3621837 (N.D. Cal. Aug. 16, 2021), which reasoned that the common law right of publicity is not infringed when the defendant "is not using Plaintiffs' name or likeness 'for promotional purposes,' i.e., to advertise or promote a separate product or service." *Id.* at *4. In *Brooks*, the plaintiffs alleged that Thomson Reuters was aggregating personal information about "millions of people" without their consent, which Thomson Reuters would then sell to its customers through an online platform called CLEAR.  *Id.* at *1.  These detailed "dossiers" allegedly contained both public and non-public information, including names, photographs, criminal history, relatives, financial information, employment information, cell phone records, and location data. *Id.*  The *Brooks* court concluded that, although this alleged practice was "deeply concerning" and "might be a gross invasion of [the plaintiffs'] privacy," it was "not a misappropriation of their name or likeness to advertise or promote a *separate* product or service." *Id.* at *4-5 (emphasis in original).  Because the alleged product "*is* [the plaintiffs'] name, likeness, and personal information," the court reasoned, it did not implicate the right of publicity.  *Id.* at *4 (emphasis in original); *see also In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 803 (N.D. Cal. 2019) (dismissing a right of publicity claim against Facebook for the sale of user information, because "[t]he allegations about how Facebook shared the plaintiffs' information with third parties is categorically different from the type of conduct made unlawful by this tort, such as using a plaintiff's face or name to promote a product or service"). [6]  Although

---

[6] Other courts have reasoned, under analogous circumstances, that the sale or rental of mailing lists does not generally constitute the commercial misappropriation of a person's name.  *See, e.g.*, *U.S. News & World Rep., Inc. v. Avrahami*, No. 95-1318, 1996 WL 1065557, at *7 (Va. Cir. Ct. June 13, 1996) ("The inclusion of a name as part of a larger mailing list for purposes of a direct mail solicitation does not constitute use of

*Brooks* concerned the common law cause of action and not the corresponding right of publicity statutes, *Farris* found it to be instructive in dismissing the statutory claims. *See Farris*, 2022 WL 10477051, at *4 (explaining that, in California, statutes are generally construed to avoid conflict with existing common law rules).

The reasoning set forth in *Brooks* and *Farris* is persuasive in deciding the present motion. As *Farris* explained, the sale of subscriber lists does not implicate the right of publicity, because it is the plaintiffs' identities themselves that are being sold. *Id.* at *4-10; *see also Huston*, 2022 WL 385176, at *3. Plaintiffs try to escape this conclusion with artful pleading: They retitle the right of publicity statutes as "misappropriation" statutes and the subscriber lists as "Data Brokerage Products," in an apparent attempt to manufacture a "product" that is separate from the data itself. Ultimately, however, the "Data Brokerage Products" consist of nothing more than the subscribers' personal information. Even assuming the "Data Brokerage Products" constitute "products" within the meaning of the statutes, Plaintiffs do not allege that the names on the lists are ever made public, nor that the third-party recipients are aware of the names included on the lists before obtaining them. It is therefore not plausible that any single name "promoted" the "Data Brokerage Products," or otherwise influenced the transactions between Hearst and the third-party recipients before they occurred.

Plaintiffs' primary argument is that each right of publicity statute contains at least two prongs—a "misappropriation" prong (use of a person's identity "on or in products"), and an

---

that name in the promotion of an actual product or service itself."); *Dwyer v. Am. Express Co.*, 652 N.E.2d 1351, 1352-53, 1356 (Ill. App. Ct. 1995) (reasoning that American Express's "practice of renting information" about cardholders does not misappropriate the cardholders' identities, because "a single, random cardholder's name has little or no intrinsic value to defendants (or a merchant)," and "defendants' practices do not deprive any of the cardholders of any value their individual names may possess"); *Shibley v. Time, Inc.*, 341 N.E.2d 337, 339 (Ohio Ct. App. 1975) (reasoning that "selling subscription lists to direct mail advertisers" does not misappropriate the plaintiffs' identities because they are not being "displayed to the public to indicate that the plaintiff [e]ndorses the defendant's product or business").

11

"endorsement" prong (use of a person's identity "for purposes of advertising")—and that the infringing activity here only implicates the former. Pls. Opp. 2; *see* Section I. At oral argument, Plaintiffs further clarified their position: They acknowledged that this case is not about a right of publicity at all. *See* Hr'g Tr. 13-14. Rather, Plaintiffs insisted that the statutes at issue protect two distinct rights—a right against misappropriation on one hand, where no public exposure is required, and a right of publicity on the other. According to Plaintiffs, *Brooks* and *Farris* are either distinguishable or wrongly decided, because those cases confused the elements of the right against misappropriation with the right of publicity.

The Court disagrees. Nothing in the text of these statutes, the legislative history, or the case law suggests that misappropriation should be isolated from the overarching right of publicity. In fact, numerous authorities have defined the right of publicity by reference to appropriation. *See, e.g.*, *In re Jackson*, 972 F.3d 25, 34 (2d Cir. 2020) (quoting *Restatement (Second) of Torts* § 652C (1977)) ("The right of publicity imposes liability on '[o]ne who appropriates to his own use or benefit the name or likeness of another.'"); *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 461 (6th Cir. 2001) ("The right of publicity is defined as an appropriation of one's name or likeness for the defendant's advantage." (internal quotation marks omitted)); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (noting that, under Section 3344 [California's right of publicity statute], "a plaintiff must prove all the elements of the common law cause of action" of "commercial misappropriation"); *Brooks*, 2021 WL 3621837, at *5 ("The use of a person's name and likeness to promote a product (other than that which pertains to the person themselves) is the essence of an 'appropriation' of one's name or likeness."); *see also Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446-47, 1447 n.7 (11th Cir. 1998) (reasoning that, even though Alabama did not recognize a right of publicity, "there is no significant difference between Alabama's

commercial appropriation privacy tort and the right of publicity [recognized in other jurisdictions]," and using the terms "interchangeably" for the rest of the opinion).[7]

Plaintiffs rely heavily on *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001), which held that the two prohibited uses in California's right of publicity statute—"on or in" a product, or for "advertising or selling" a product—are "not synonymous." *Id.* at 802. But the distinction that *Comedy III* draws between the two prongs is not the same distinction that Plaintiffs are attempting to make. In *Comedy III*, the defendant, an artist named Gary Saderup, used an original charcoal drawing of The Three Stooges to make lithographic prints and silkscreened images on t-shirts. *Id.* at 800. Saderup then sold those prints and t-shirts without permission from Comedy III, the registered owner of the rights to The Three Stooges' former comedy act. *Id.* at 800-01. Saderup argued that California's right of publicity statute only applies to unauthorized advertising, and because his prints and t-shirts "did not constitute an advertisement, endorsement, or sponsorship of any product," he was not liable. *Id.* at 801. The California Supreme Court rejected this argument, explaining that the statute covers two distinct types of conduct: (1) placing a person's likeness on a product, such as "a celebrity's name on a 'special edition' of a vehicle," and (2) advertising or selling a product, such as "using that name in a commercial to endorse or tout the same or another vehicle." *Id.* at 802. Both of these examples, however, can be understood as *promoting* the vehicle being sold—the first through merchandising or branding, and the second through external advertising.

---

[7] The fact that seven of the statutes at issue—Alabama, Hawaii, Indiana, Nevada, Ohio, Puerto Rico, and South Dakota—contain reference to "Right[s] of Publicity" or "Publicity Rights" in the title of the relevant statutory scheme or statutory provision casts further doubt on Plaintiffs' argument that the right of publicity is not relevant here. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (reasoning that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute").

13

Indeed, in finding Saderup liable, the court in *Comedy III* emphasized how he used The Three Stooges' likeness to sell a separate, tangible product:

> Saderup sold more than just the incorporeal likeness of The Three Stooges. Saderup's lithographic prints of The Three Stooges are themselves tangible personal property, consisting of paper and ink, made as products to be sold and displayed on walls like similar graphic art. Saderup's T-shirts are likewise tangible personal property, consisting of fabric and ink, made as products to be sold and worn on the body like similar garments. By producing and selling such lithographs and T-shirts, Saderup thus used the likeness of The Three Stooges "on . . . products, merchandise, or goods" within the meaning of the statute.

*Id.* *Comedy III* thus supports the logical notion that, even for the so-called "misappropriation" prong, the "product" must be separate from, and promoted by, the person's identity being used "on or in" the product. *See Farris,* 2022 WL 10477051, at *5 (reasoning that "both prongs, advertising and merchandising, involve some aspect of promotion of another product," and that in *Comedy III*, "the likenesses themselves were not the product—the prints and t-shirts bearing those likenesses were"). To be clear, the Court recognizes that the separate "prongs" of these right of publicity statutes are distinct. But the distinction is between merchandising and branding on one hand, and advertising on the other. The distinction is not, as Plaintiffs urge, between a right against "misappropriation" and the right of publicity itself.

Plaintiffs also cite *Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865 (W.D. Wash. 2021) in arguing that publicity is not required under these so-called "misappropriation" statutes, *see* Hr'g Tr. 13-14, but that case too is inapposite. In *Knapke*, the plaintiff brought a claim under Ohio's right of publicity statute against the operator of Classmates.com, for "us[ing] her name and photo in advertisements on the Classmates website to advertise and/or . . . sell Defendant's products and services." 553 F. Supp. 3d at 872. Plaintiffs emphasize that this claim survived a motion to dismiss, even though there was no allegation that anyone actually viewed the plaintiff's photograph on the website. *Id.*; *see* Hr'g Tr. 14. What Plaintiffs fail to engage with, however, is

14

the fact that the offending image was still posted on the internet—"which is available to the public at large"—and it was used to "market [Defendant's] products and services" through that public platform. 553 F. Supp. 3d at 876. *Knapke* does not suggest that a plaintiff's information, sold to third parties but not to the general public, would violate Ohio's right of publicity statute—or any other right of publicity statute, for that matter.

Finally, Plaintiffs rely on *In re Clearview AI, Inc., Consumer Privacy Litigation*, 585 F. Supp. 3d 1111 (N.D. Ill. 2022) and *Ohio State University v. Redbubble, Inc.*, 989 F.3d 435 (6th Cir. 2021) for the proposition that the mere sale of a name or photograph, unattached to the promotion of a separate product, violates these statutes. Neither case supports their position. In *Clearview*, the defendant scraped approximately three billion facial images from public websites, scanned biometric identifiers from the images, and then used that biometric information to create, and sell access to, a searchable database of the images. 585 F. Supp. 3d at 1118. The court concluded that the plaintiffs properly stated right of publicity claims under California, New York, and Virginia law. In so doing, it reasoned that, even though the defendant was not advertising any products or services, the defendant "knowingly used [the plaintiffs'] photos by accessing the Clearview database for a profit." *Id.* at 1129. As Hearst admits, *Clearview* is arguably in tension with *Brooks*, which also involved a mass aggregation of personal data that was subsequently sold through a database. *See* Def. Reply Br. 4 n.2. Regardless, *Clearview* is distinguishable here, as it contains no analysis of the meaning of "on or in products," nor did the *Clearview* defendant argue that the "product" must be separate from the identities themselves. *See* 585 F. Supp. 3d at 1129. By contrast, the facts here are plainly more analogous to the facts in *Huston* and *Farris*.

And in *Redbubble*, a public university filed suit against an online retailer of third-party goods for "unlawfully [selling] products bearing the image of Urban Meyer, [Ohio State

15

University's] former head football coach." 989 F.3d at 443. According to Plaintiffs, *Redbubble* demonstrates that the sale of a photograph itself can violate the right of publicity statutes, even when it is not used to promote a separate product. *See* Hr'g Tr. 15. There are two problems with that argument. First, nowhere in the opinion does the Sixth Circuit state that the right of publicity claim was sustained on the sale of a mere photograph. Rather, the allegation was that Redbubble "sold *products* bearing the image of Urban Meyer." 989 F.3d at 443 (emphasis added); *see also id.* at 440 ("Products for sale on Redbubble's website include apparel, wall art, and other accessories emblazoned with an image selected by a consumer."). Second, even assuming Redbubble did sell photographs of Urban Meyer that were unattached to any other product, these photographs would have been sold on Redbubble's public, online marketplace, and the use of Urban Meyer's likeness would have necessarily influenced the purchase of his photograph. Again, here there is no allegation that Plaintiffs' information was ever publicly available or made known to the third-party recipients before they obtained the subscriber lists.[8]

At bottom, Plaintiffs cannot identify any case, in any jurisdiction, that supports their interpretation of the right of publicity statutes as applied to the sale of subscriber lists. Nor do Plaintiffs offer any viable limiting principle for their reading of the statutes. Under Plaintiffs' interpretation, the statutes would appear to prohibit the sale of many routine forms of personal information, including, as Hearst points out, telephone and professional directories. Def. Br. 2.

---

[8] Two other cases mentioned in Plaintiffs' brief are even less convincing. In *Bravado International Group Merchandising Services, Inc. v. Sean Broihier & Associates*, No. cv-14-03375-MWF, 2015 WL 13915022 (C.D. Cal. Aug. 17, 2015), the defendant placed the likenesses of various musicians and musical groups on items such as "prints, postcards, and cell phone cases, for sale." *Id.* at *1. Like *Comedy III*, *Bravado* thus plainly involved the promotion of separate, tangible products. In *Bosley v. Wildwett.com*, 310 F. Supp. 2d 914 (N.D. Ohio 2004), the defendant placed the plaintiff's name, image, and likeness on the cover of a video, which, according to the court, "clearly constitute[d] an advertisement for the video." *Id.* at 922. As Plaintiffs have made clear, they are not alleging that Hearst advertised any products here.

The Court declines to adopt such a far-reaching interpretation. *See Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (cautioning that a federal court's "role . . . sitting in diversity is not to adopt innovative theories that may distort established state law" (internal quotation marks omitted)).

Accordingly, the Court concludes that Hearst's alleged sale of its subscriber lists does not implicate the nine right of publicity statutes at issue, and all of Plaintiffs' claims are dismissed. Because the Court finds no statutory violation, the Court does not reach the alternative question of whether the right of publicity statutes violate the First Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. The Clerk of Court is respectfully requested to terminate the motion pending at docket number 37 and close this case.

SO ORDERED.

Dated:    December 19, 2022
          New York, New York

_____
Ronnie Abrams
United States District Judge